UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13538-RGS

58 SWANSEA MALL DRIVE, LLC

v.

GATOR SWANSEA PROPERTY, LLC

PARTIAL ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

August 25, 2017

STEARNS, D.J.

Defendant Gator Swansea Property, LLC, seeks summary judgment in this lawsuit brought by plaintiff 58 Swansea Mall Drive, LLC, over a failed effort by 58 Swansea to negotiate a loan secured by its lease on a shopping center located (unsurprisingly) in Swansea, Massachusetts. For the following reasons, the motion is granted in part and denied in part.

BACKGROUND

The following facts are presented in the light most favorable to 58 Swansea as the nonmoving party. 58 Swansea leases a commercial development in Swansea from Gator. 58 Swansea, in turn, subleases the storefronts. Beginning in 2013, Gator made a series of demands that 58 Swansea make repairs to the property. 58 Swansea contested many of

Gator's characterizations of the condition of the property, but agreed to make most of the repairs.

To fund some of the repairs, 58 Swansea applied for a $2 million loan from United Bank, secured by its interest in the property. The ground lease permitted 58 Swansea to mortgage its leasehold under certain conditions. Pertinent here is the requirement that 58 Swansea could not be "in default . . . beyond the applicable grace periods." Dkt #162-1, Art. 6, § 3. To satisfy United Bank that this requirement was met, 58 Swansea invoked Article 14, Section 4 of the lease, which obliges Gator to "deliver an estoppel certificate" within ten days of request. The lease required that the estoppel certificate verify that the lease remained "in full force and effect" and describe "any set-offs or defenses against the enforcement of any of the agreements, terms, covenants or conditions of this Lease and any modifications of this Lease upon the part of Tenant to be performed or complied with, and if so, specifying the same." Art. 14, § 2.

According to 58 Swansea, Gator's initial estoppel certificate was insufficient: it did not state that the lease was "in full force and effect" and it identified defaults based on "maintenance" without providing sufficient specificity about what 58 Swansea needed to do to cure the defaults. Gator provided another estoppel certificate at the end of July of 2015 — over a

month after 58 Swansea's original request — but the replacement certificate still listed defaults triggering maintenance obligations, now four in number. 58 Swansea contends that many of the defaults listed in both estoppel certificates were pretextual.

Because the estoppel certificate Gator provided listed additional maintenance tasks in default of the lease, United Bank requested confirmation from Gator that it would provide the certification envisioned by Article 6, Section 3(n) of the lease. That section provides that in the event the tenant mortgages its leasehold interest, the landlord will "upon request, execute, acknowledge and deliver to each Leasehold Mortgagee making such request an agreement prepared at the sole cost and expense of the Tenant, in form reasonably satisfactory to such Leasehold Mortgagee, between Landlord, Tenant, and such Leasehold Mortgagee, agreeing to all of the provisions of this Section."

The 3(n) agreement proved to be less a solution than a new problem. United Bank sent a draft 3(n) agreement and a copy of the mortgage to Gator on August 18, 2015. Over the ensuing two months, the parties never managed to reach an acceptable 3(n) agreement. 58 Swansea argues that this resulted from Gator's attempt to force it to impose a lease of an outparcel on the property to Chick-Fil-A. It points to an August 21, 2015 internal email

from Gator's CEO to the company's general counsel, which 58 Swansea reads as conditioning compliance with the 3(n) agreement on its willingness to relinquish the outparcel. On August 31, Gator's general counsel emailed outside counsel for 58 Swansea with a proposal regarding the outparcel. 58 Swansea's counsel responded the next day, asking about the status of the 3(n) agreement and stating that he would forward the proposal to his client. Gator's counsel responded that Gator was reviewing the relevant documents and would respond soon.

Concerned with Gator's hesitation, 58 Swansea and United Bank agreed to a "dry closing," meaning that the mortgage documents were signed and the mortgage recorded, but that the mortgage itself would remain unfunded until the 3(n) agreement was executed. The "dry closing" was executed on September 8, 2015. On September 22, 58 Swansea again requested that Gator comply with Section 3(n) of the lease. On September 24, Gator asked for a telephone conference with 58 Swansea's CEO. 58 Swansea refused the request, stating that it believed litigation was likely if the 3(n) agreement was not forthcoming. Gator responded by writing that it preferred a call: "We made a proposal several weeks ago to your client . . . concerning an outparcel to the property and have not yet heard a response. I think that a conversation would be beneficial for both Gator and your

4

client." Dkt 82-16. 58 Swansea again rejected the request. On October 1, Gator made another attempt, emailing about the outparcel and providing a site plan. This lawsuit was filed the next day.

The filing of the lawsuit brought an end to discussions about the outparcel, but not to disputes about the 3(n) agreement. On October 5, Gator sent a notice of termination and default, purporting to terminate the ground lease, and then two days later revoked its estoppel certificate. 58 Swansea alleges that these actions were purely retaliatory steps taken in response to its filing of this suit. On October 13, 58 Swansea sought a preliminary injunction to block the termination and force Gator to sign the 3(n) agreement. Gator wrote to 58 Swansea the following day, proposing a solution and mentioning (apparently for the first time) the possibility that the mortgage's proposed division of insurance proceeds conflicted with the lease. Gator expressed its willingness to sign a 3(n) agreement if it made clear "that United Bank's rights as mortgagee can in no way supersede Gator Swansea's rights under the Ground Lease, such as Gator Swansea's right to receive insurance proceeds and condemnation awards." Dkt 166-4, Ex. 85 at 4. No resolution followed. The preliminary injunction was denied after a hearing on October 15, at which Gator represented to the court that it had

withdrawn both the lease termination and the revocation of the estoppel certificate.

On October 16, Gator iterated concerns about the insurance provisions of the mortgage. Over the ensuing week, Gator, United Bank, and 58 Swansea exchanged versions of a proposed 3(n) agreement. Although the details differ, Gator's desired changes attempted to specify that the lease's provisions controlled, particularly with respect to the distribution of insurance proceeds. United Bank rejected Gator's changes.

United Bank eventually set a deadline of 5 p.m. on October 22 to receive an executed 3(n) agreement from Gator. On October 22, United Bank rejected the most recent version of the 3(n) agreement proposed by Gator, and the 5 p.m. deadline passed without any agreement. United Bank terminated the loan on October 28.

58 Swansea's original Complaint limned four counts against Gator, a number enlarged to six in an Amended Complaint filed in April of 2016. Gator moved to dismiss, which was denied as to all counts except for Count VI.[1] After a lengthy and contentious discovery period, Gator has moved for

---

[1] 58 Swansea supplemented its Complaint in September of 2016, adding two additional counts related to a notice of default issued during the pendency of the litigation. Those counts (Counts VI and VII of the operative Complaint) are dealt with by separate order.

summary judgment. This Order addresses Counts I-V of the operative Complaint (Dkt #86). The court heard argument on August 9, 2017.

DISCUSSION

Summary judgment is appropriate when the record, viewed in the light most favorable to the nonmoving party, reveals "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party seeking summary judgment must demonstrate to the court the absence of genuinely disputed material facts by reference to the record. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once that task is accomplished, "the burden shifts to the nonmoving party, who must, with respect to each issue on which she would bear the burden of proof at trial, demonstrate that a trier of fact could reasonably resolve that issue in her favor." *Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010).

Count I

Count I of 58 Swansea's Complaint asserts that Gator breached the lease by failing to timely provide the 3(n) agreement.[2] As Gator points out,

---

[2] In its papers, 58 Swansea asserts an additional breach by Gator in failing to provide an acceptable estoppel within the ten days allowed by the lease. Even assuming this breach occurred, 58 Swansea does not explain how it was harmed by the failure to provide the estoppel certificate when 1) an

this raises an antecedent question: at what point did Gator have an obligation to sign the 3(n) agreement? The terms of the lease describe it as an obligation that arises only once a leasehold mortgage is "in effect," further underscored by the fact that the lease requires that a "true copy" of the mortgage and recording information be delivered within thirty days of execution of the mortgage to trigger the 3(n) obligation. Gator contends that because the mortgage was never fully funded, the mortgage was not "in effect," and, moreover, it was never provided with a "true copy" of the mortgage because it never received the letter agreement providing for a dry closing. Thus, it says, neither condition precedent was met and no breach occurred.

Neither argument is persuasive. In the absence of a contractual definition, the ordinary meaning of a term controls in contract interpretation. *See Rogaris v. Albert*, 431 Mass. 833, 835 (2000). "[A] contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties. 'Justice, common sense, and the probable intention of the parties are guides to construction of a written instrument.'" *Shane v. Winter Hill Fed. Sav. & Loan Ass'n*, 397 Mass. 479, 483 (1986) (internal citation omitted) (quoting

---

acceptable estoppel did eventually issue on July 30, 2015, and 2) the loan remained open until October 28, 2015.

*Stop & Shop, Inc. v. Ganem*, 347 Mass. 697, 701 (1964)). Here, the mortgage was signed and recorded, and ordinary meaning and common sense say that it was "in effect." Nor was Gator deprived of a "true copy" of the mortgage. It received the signed mortgage and the recording information in late September. Nothing more was required.[3]

Gator also points to a third condition precedent: that 58 Swansea not be "in default . . . beyond the applicable grace periods." Gator asserts that this condition was not satisfied because 58 Swansea had failed to name Gator as an "additional named insured" under 58 Swansea's insurance policies as required by Article 4, Section 2 of the lease. Yet while 58 Swansea may have been in default, Gator offers nothing that proves that this default was "beyond the applicable grace period[]." Gator's cited support consists of two letters informing 58 Swansea that Gator had not received proof of insurance. Neither letter, however, places 58 Swansea on notice of a default, as required

---

[3] Moreover, 58 Swansea informed Gator that the funding of the loan and the final interest rate were contingent on receiving the signed 3(n) agreement. As neither provision appeared on the face of the mortgage, Gator was on notice that 58 Swansea and United Bank had reached a side arrangement with respect to those provisions. Yet Gator never expressed concern that it did not have the details of that arrangement, nor did it request documents related to it among its many other demands for documents connected to the mortgage and the ground lease.

by Article 12, Section 1(b)(ii) of the lease.⁴ Gator thus cannot prevail on this argument.

Of greater weight is Gator's contention that no breach occurred because 58 Swansea (and United Bank) prevented it from signing the 3(n) agreement and performing its obligations under the lease. *See Winchester Gables, Inc. v. Host Marriot Corp.*, 70 Mass. App. Ct. 585, 596 (2007). Specifically, it contends that the terms of the mortgage were in conflict with the provisions of the ground lease governing the distribution of insurance proceeds. Section 4 of the mortgage provided:

> Unless otherwise required by the Ground Lease and except as hereinafter provided, the proceeds of any insurance resulting from any loss with respect to the Property shall be paid to the Bank and, after the occurrence of an Event of Default, at the option of the Bank, shall be applied to the Obligations in such order as the Bank shall determine; provided however that, notwithstanding any such Event of Default if the Bank shall require restoration or repair of the Property, the Bank may release all or any portion of such proceeds to Mortgagor for such purpose, subject to such terms and conditions as the Bank may reasonably require. Any insurance proceeds paid to Mortgagor shall be held in trust for the Bank and promptly paid to it. . . .

---

⁴ Gator contends that 58 Swansea deceptively prevented Gator from learning of the insurance default in July of 2015 by providing false insurance certificates. However, Gator has offered no evidence suggesting that 58 Swansea knew of the alleged gaps in insurance coverage at the time the certificates were provided.

This provision, Gator complains, went beyond the permissions embodied in Article 6, Section 3(i) of the ground lease, which allowed 58 Swansea to add United Bank "to the 'Loss Payable Endorsement' of any and all insurance policies . . . on condition that the insurance proceeds are to be applied (either by Tenant or by any such Leasehold Mortgagee) in the manner specified in this lease." In particular, Gator points to Article 5 of the lease, which lays out requirements for the distribution of insurance proceeds, including the requirement that the tenant must (under most circumstances) use the proceeds for reconstruction of the premises or pay the proceeds to the landlord. Gator also had the right under the lease to mortgage its own interest in the property, identifying its mortgagee as having priority to the insurance proceeds.

The success of this argument turns on the interpretation of Section 3(n), which states that the landlord "shall, upon request, execute" an agreement "prepared at the sole cost and expense of Tenant, in form reasonably satisfactory to [the] Leasehold Mortgagee, between Landlord, Tenant, and such Leasehold Mortgagee, agreeing to all of the provisions of this section." The court's tentative view is that Section 3(n) describes a hard and fast duty. In other words, Section 3 appears to provide pre-set, non-negotiable contractual terms that bind landlord, tenant, and mortgagee. On

this reading, Gator's duty was simply to execute an agreement acknowledging the provisions of Section 3 after being presented with the mortgage and recording information. This reading is in line with the requirement that the agreement be "in form reasonably satisfactory to" United Bank, as it is the mortgagee's interests that Section 3 is chiefly designed to protect. *See, e.g.*, § 3(e) (in the event the original lease terminates, the landlord must enter into a new lease with the mortgagee); § 3(k) (the mortgagee has the right to exercise options to extend the lease term in the event the tenant does not). It is also a sensible understanding of the lease terms given that Section 3 envisions a signed and recorded mortgage that is already in effect when the 3(n) agreement is requested and signed. Not only would these pre-set terms provide a predictable framework for negotiations between the tenant and mortgagee, but the facts of this case readily demonstrate the risks and inefficiencies of bringing a third party into the mortgage negotiations at a late date.

On the other hand, Section 3(n) describes an agreement "between Landlord, Tenant, and . . . Leasehold Mortgagee" about the terms of the lease. Section 3(n) is silent about what should happen in the event one party believes that the mortgage violates the terms of Section 3 or conflicts with its other rights under the lease. Under the circumstances, Gator contends, there

could be no 3(n) agreement because United Bank and 58 Swansea would not agree to abide by Section 3(i)'s rules about insurance. There is a certain intuitive force to the idea that it would be illogical to expect a landlord to sign a 3(n) agreement knowing that the mortgage contradicts the terms of the lease, particularly where a condition precedent for the 3(n) agreement is the landlord's receipt of a "true copy" of the mortgage for review.

Under the circumstances, the court will treat the Section 3(n) language as ambiguous. This conclusion, in combination with the disputed facts about the reasonableness of Gator's performance, precludes summary judgment. *See Seaco Ins. Co. v. Barbosa*, 435 Mass. 772, 779 (2002) (where contractual language is ambiguous, and no extrinsic aids resolve the ambiguity, allegations of breach must go to the factfinder). In particular, if the court concludes that the first reading of Section 3(n) controls, there is a fact question about whether Gator performed within a reasonable time. *See Lubin & Meyer, P.C. v. Lubin*, 427 Mass. 304, 310 (1998). At trial, the court will hear evidence about the parties' understanding of Section 3(n) in addition to evidence regarding a potential breach under either of the competing interpretations.[5]

---

[5] Gator also suggests that 58 Swansea cannot prove any damages from the breach. Its arguments on this point chiefly attack the conclusions of 58 Swansea's damages expert. Gator, however, has not filed a *Daubert* motion

Counts II and IV

In Count II, 58 Swansea charges Gator with a breach of the implied covenant of good faith and fair dealing, invoking two separate theories. First, it contends that Gator breached the covenant by sending baseless default notices and demanding more expensive repairs than necessary to the property. Second, it argues that Gator attempted to extort an unbargained-for benefit (the concession of an outparcel on the property) in exchange for its performance. The latter theory also forms the basis of Count IV, a claim under the Massachusetts Consumer Protection Statute, Mass. Gen. Laws ch. 93A, § 11.

"The covenant of good faith and fair dealing is implied in every contract." *Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The covenant requires parties to "deal honestly and in good faith in both the performance and enforcement of the terms of their contract." *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200, 211 (1993). The plaintiff need not prove bad faith, but merely "a lack of good faith," which "can be inferred from the totality of the circumstances." *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 570 (2010).

---

to contest the reliability of the expert's testimony, and on this record the existence or amount of damages remains a disputed fact question.

Gator argues that because it has not breached the lease, it cannot have breached the covenant of good faith and fair dealing, citing the aphorism that "[t]he covenant may not . . . be invoked to create rights and duties not otherwise provided for in the existing contractual relationship." *Uno Rests.*, 441 Mass. at 385. Gator insists that it had a right to enforce the provisions of the lease, particularly those related to insurance obligations. Its conduct in sending other default notices, Gator contends, was likewise in good faith and cannot constitute a breach of the covenant.

Gator's argument misses the point. The relevant question is not whether Gator had a right to enforce the provisions of the contract, but whether Gator took advantage of those provisions either to avoid performance or to coerce 58 Swansea into ceding unbargained-for benefits. The covenant is breached by exploiting "a discretionary right . . . as a pretext" to extract concessions, *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473 (1991), or by "tak[ing] an extreme and unwarranted view of [a party's] rights under the contract" to justify a refusal to engage in good faith efforts to resolve any concerns, *Robert & Ardis James Found. v. Meyers*, 474 Mass. 181, 191 (2016).

The record reveals genuine disputes of material fact about Gator's good faith in issuing default notices regarding maintenance at the property. The

parties have generated dueling reports and testimony about the condition of the property, the necessity of repairs, and the adequacy of the steps taken by 58 Swansea. There is thus a triable issue as to whether Gator's default notices and repair demands reflected good faith or an unjustifiably aggressive view of its rights under the lease.

58 Swansea's second theory of breach is that Gator attempted to hold the 3(n) agreement hostage to a ransom of the outparcel. *See Anthony's Pier Four*, 411 Mass. at 473. Moreover, it contends, this conduct represented an unfair act in violation of Mass. Gen. Laws ch. 93A, § 11. Under section 11, "conduct 'in disregard of known contractual arrangements' and intended to secure benefits for the breaching party constitutes an unfair act or practice." *Id.* at 474 (quoting *Wang Labs., Inc., v. Bus. Incentives, Inc.*, 398 Mass. 854, 857 (1983)). Such conduct must be more than a mere breach of contract, but must involve a breach with "an extortionate quality that gives it the rancid flavor of unfairness." *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219, 226 (1992).

These claims, too, survive summary judgment. Gator contends that no evidence links the 3(n) agreement and the outparcel concession. This argument is based in part on timing: if Gator had truly wanted to extort the outparcel, it says, it would have done so in response to 58 Swansea's request

16

for an estoppel certificate, which it represented as the last step necessary to close on the loan. But record evidence suggests that negotiations with Chick-Fil-A about the outparcel became more serious after the estoppel certificate was provided, and a reasonable inference from the summary judgment record is that Gator took advantage of a new opportunity to leverage 58 Swansea over the outparcel.

Gator contends that the extortion theory lacks evidentiary support because it never explicitly linked the 3(n) agreement and the outparcel in any communication with 58 Swansea. The argument is not dispositive. The record reflects that Gator received the draft mortgage and initial request for a 3(n) agreement on August 18. Three days later, Gator's CEO sent an email that could be read as instructing his general counsel to pressure 58 Swansea into agreeing to cede the outparcel as a condition of the 3(n) agreement. Shortly thereafter, Gator made a proposal regarding the outparcel and referenced it on several occasions in response to questions from 58 Swansea about the 3(n) agreement. Whether Gator intended to withhold its compliance with the request for a 3(n) agreement in order to extract the outparcel from 58 Swansea is thus a question for the factfinder.

Second, Gator contends that because it engaged in good faith efforts to sign a 3(n) agreement, summary judgment should be granted in its favor.

17

The efforts Gator points to, however, began only after 58 Swansea filed this lawsuit alleging that the outparcel concession was being held out as a quid pro quo for the 3(n) agreement. It was at that point that Gator stopped referring to the outparcel in its conversations with 58 Swansea, turning instead to its concerns about the insurance provisions of the mortgage. The good-faith negotiation argument thus does not support summary judgment.[6]

### Counts III and V

58 Swansea advances a second Chapter 93A claim (Count V) based on Gator's attempt to terminate the ground lease and revoke the estoppel shortly after this suit was filed. Gator seeks summary judgment on this count, and 58 Swansea has not offered any argument in opposition. Summary judgment will therefore be allowed on Count V.

---

[6] The good faith (or lack thereof) of Gator's negotiating stance might be relevant to 58 Swansea's damages. If Gator did negotiate in good faith and the collapse of the 3(n) agreement was attributable to legitimate concerns, then 58 Swansea's damages might be limited to the costs it incurred resisting the unjustified demands for the outparcel. *See Siegel v. Berkshire Life Ins. Co.*, 64 Mass. App. Ct. 698, 703 (2005) ("If a [Chapter] 93A violation forces someone to incur legal fees and expenses that are not simply those incurred in vindicating that person's rights under the statute, those fees may be treated as actual damages in the same way as other losses of money or property.").

Count III seeks specific performance, compelling Gator to provide a signed 3(n) agreement.  As the loan has been terminated, this count is now moot.

ORDER

Gator's motion for summary judgment (Dkt #164) is <u>GRANTED</u> as to Counts III and V.  The motion is <u>DENIED</u> as to Counts I, II, and IV.

SO ORDERED.

/s/ Richard G. Stearns

_____

UNITED STATES DISTRICT JUDGE