UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13538-RGS

58 SWANSEA MALL DRIVE, LLC

v.

GATOR SWANSEA PROPERTY, LLC

ORDER ON PLAINTIFF'S MOTION FOR SUMMARY
JUDGMENT AND PARTIAL ORDER ON DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT

August 25, 2017

STEARNS, D.J.

58 Swansea Mall Drive, LLC, the tenant in a leasehold to a shopping center in Swansea, Massachusetts, and its landlord, Gator Swansea Property, LLC, dispute 58 Swansea's right to use a pylon sign at the shopping center. Extensive briefing has supported the two motions for summary judgment. For the following reasons, the court grants 58 Swansea's motion, grants in part and denies in part Gator's motion, and grants summary judgment to 58 Swansea *sua sponte* on one of its claims.

BACKGROUND

The facts relevant to the disposition of these motions are for all practical purposes undisputed. The shopping center at issue is subject to a lease entered into in 1984 by Equity Properties and Development Co. as

landlord and Service Merchandise Co. as tenant. In 1989, Equity Properties constructed the pylon sign after receiving a permit from the Town of Swansea. From 2001 to November of 2013, the landlord under the lease was Carlyle Swansea Partners, LLC, and during that period, the pylon sign was used to advertise an adjacent mall and its tenants. No tenants or subtenants of the shopping center were featured on the sign while Carlyle was landlord. In August of 2012, Carlyle recorded an easement granting Wal-Mart (a tenant of the adjacent mall) the right to place signage of its own on the pylon.

In June of 2013, 58 Swansea became the tenant under the lease. The lease assignment to 58 Swansea identified the leasehold as subject to two exceptions pertinent to this case: the 1989 sign permit and the 2012 easement granted to Wal-Mart. In November of that year, Gator became 58 Swansea's landlord after acquiring Carlyle's interest in the lease. In connection with this transaction, 58 Swansea provided a tenant estoppel certificate indicating that it knew of no defaults under the lease. At the same time, Gator granted Carlyle an easement permitting it to construct a new sign on the property advertising the adjacent mall, which Carlyle still owned. Carlyle did so, and it appears from images in the summary judgment record that the Wal-Mart sign has since been affixed to that signboard.

After Gator assumed the lease, no tenant or subtenant of the shopping center used the pylon until August of 2016, when a sign for PriceRite (one of 58 Swansea's subtenants) was installed. Gator sent 58 Swansea a notice of default on August 18, 2016, claiming that use of the pylon breached the lease. On September 15, 58 Swansea supplemented its Complaint in this action, seeking a declaration "that the Notice of Default was without merit and that therefore 58 Swansea is not in default under the lease" (Count VI) and injunctive relief (Count VII). In its answer to the Supplemental Complaint, Gator filed a counterclaim, asserting that 58 Swansea had breached the lease by encroaching on the pylon sign.

In due course, 58 Swansea moved for summary judgment on the counterclaim, and Gator sought summary judgment on 58 Swansea's supplemental claims.[1] The court heard argument on these motions on August 9, 2017.

DISCUSSION

The only question presented by the motions is whether 58 Swansea has breached the lease by making use of the pylon sign. Interpretation of the lease, like any contract, is a question of law for the court. *Balles v. Babcock*

---

[1] Gator also moved for summary judgment on the other five claims advanced by 58 Swansea. Those claims are addressed in a separate order.

*Power Inc.*, 476 Mass. 565, 571 (2017).  Unambiguous language must be interpreted "according to its plain meaning."  *Id.*  "The words of a contract must be considered in the context of the entire contract rather than in isolation."  *Gen. Convention of the New Jerusalem in the United States of Am., Inc. v. MacKenzie*, 449 Mass. 832, 835 (2007).

Gator relies on two sections of the lease.  Article 23, titled "Signs," grants three signage rights to the tenant: 1) the right to install interior signage, as well as exterior signage as specified on an attached plan; 2) the right to use a different, then-existing sign on the property; and 3) the right to construct a pylon sign of its own.  This, Gator contends, excludes by implication any claim to other signage on the property, including the pylon sign at issue.  Gator therefore argues that the pylon is governed by Article 25, Section 1 of the lease, which permits the tenant "to make alterations and improvements from time to time both structural and non-structural," but specifies that "exterior alterations to the structure shall first be approved by Landlord."  Gator argues that 58 Swansea breached Article 25 by failing to seek permission before altering the pylon sign.

The problem with this argument is that Article 25 requires prior approval of "alterations to *the structure*."  The term "structure" is not defined in the lease, and its insertion in Article 25 is virtually *sui generis*.

Consequently, the plain meaning of the term in its context controls. This presents two interpretive possibilities, neither of which covers the pylon sign. The first is that "structure" refers simply to the building housing the storefronts. When initially executed in 1984, the lease required the then-tenant "to construct on the land *the* building and improvements" shown on an attached exhibit. Art. 3, § 2 (emphasis added). Unsurprisingly, the current property consists of a single building containing two storefronts. Two aspects of Article 25 link it to the original building envisioned by the lease. First, it is not uncommon to refer to a building as a structure. *See, e.g.*, "Structure," *Black's Law Dictionary* (5th ed. 1979) ("Any construction, or any production or piece of work artificially built up or composed of parts joined together in some definite manner. That which is built or constructed; an edifice or building of any kind."). Understood in this sense, the use of the singular term "structure" in Article 25 corresponds to the singular "building" envisioned by Article 3, Section 2. Second, an "exterior alteration[]" to a "structure" is logically read to refer to changes to the exterior of a building, such as work on a façade. This understanding is reinforced by the contrast between exterior alterations to the structure (which require landlord approval) and improvements (which do not). "Improvements" is a broader category that includes "buildings, but may also include any permanent

5

structure or other development, such as a street, sidewalks, sewers, utilities, etc." "Improvements," *Black's Law Dictionary* (5th ed. 1979). On this reading, the requirement that 58 Swansea seek prior approval for "alterations to the structure" does not encompass other features of the site, such as the pylon sign.

Gator argues a second interpretive possibility. It points out that the term "structure" is also used in Article 23, where an existing sign on the property is twice identified as a "pylon sign structure." Thus, it argues, any alteration to "the structure" must refer to the signage on the property. But even if the term "structure" in Article 25 refers to Article 23, it would prove only that Article 25 grants the landlord veto power over alterations to the particular "pylon sign structure" described in Article 23. This understanding is confirmed by the lease's limitation of the prior approval requirement to "alterations to *the structure*," in the singular. Nothing about either article purports to give the landlord approval authority over future signs at the property, including (for example) signs built under Article 23's provision for signs constructed by the tenant.[2] Under either theory, then, there is no breach of Article 25.

---

[2] Notably, the term "structure" does not appear in this grant: "Tenant may, in compliance with all legal requirements, construct a pylon sign on the demised premises." Art. 23.

Finally, Gator's argument that it has exclusive rights to the pylon sign does not establish a breach of the lease. Gator bases this claim on the two exceptions identified in 58 Swansea's assumption of the lease. Because 58 Swansea took the lease subject to the 1989 permit granted to the then-landlord and the 2012 Wal-Mart easement, and raised no concerns in its 2013 estoppel despite the landlord's continuous use of the pylon, Gator contends that 58 Swansea has implicitly acknowledged Gator's ownership of the pylon.

Perhaps so. But this argument does nothing to connect 58 Swansea's appropriation of the pylon sign to any provision of the lease. 58 Swansea is not accused of violating either the 1989 permit or the 2012 easement. Gator points to no other provision of the lease that 58 Swansea breached by using the pylon. Gator admits that this specific pylon sign is never discussed in the lease, and that there is no provision describing a blanket prohibition on use that might encompass the pylon.

To be clear, it is entirely possible that Gator owns the pylon sign, and that 58 Swansea's use of it infringes Gator's rights. Gator has identified a host of potentially viable arguments for rejecting 58 Swansea's asserted rights in the pylon. *See* Opp'n at 10 n.4 (listing the statute of limitations, "waiver, laches, ratification, acquiescence, easement by prescription and

7

estoppel" as grounds for rejecting 58 Swansea's claim). But whatever ownership interest Gator has in the sign is not protected by the terms of the lease and must be asserted in an action at common law. Summary judgment on the counterclaim is therefore granted to 58 Swansea.

These conclusions also resolve Gator's motion for summary judgment on 58 Swansea's declaratory judgment claim. Although the parties have at times treated this case as definitively resolving the question of ownership of the pylon, 58 Swansea's request for declaratory relief is more modest: it seeks only a declaration "that the Notice of Default was without merit and that therefore 58 Swansea is not in default under the lease." Given the conclusion that no breach of the lease (and thus no default) exists, it is a foregone matter to deny Gator's motion for summary judgment on Count VI of 58 Swansea's Complaint.

In light of these conclusions, the court will also enter summary judgment for 58 Swansea on Count VI. *See* Fed. R. Civ. P. 56(f). Under Rule 56(f), the court can only grant summary judgment in this fashion if "discovery is sufficiently advanced that the parties have enjoyed a reasonable opportunity to glean the material facts" and "the targeted party" has received "appropriate notice and a chance to present its evidence on the essential elements of the claim or defense." *Block Island Fishing, Inc. v. Rogers*, 844

F.3d 358, 363 (1st Cir. 2016) (quoting *Berkovitz v. Home Box Office, Inc.*, 89 F.3d 24, 29 (1st Cir. 1996)). Here, the parties conducted full discovery and have exhaustively briefed the issue. The court has concluded that, as a matter of law, the lease does not cover the pylon sign. Nothing remains to be resolved at trial on Count VI.

Finally, Count VII seeks injunctive relief maintaining the status quo (in the form of PriceRite's continued use of the pylon sign) and tolling the grace periods for curing a default under the lease until after resolution of Count VI. As no injunction ever issued, and as the court has concluded that no default occurred, and as PriceRite has apparently continued to use the sign in the meantime, Gator is correct that this count is no longer viable. Summary judgment will therefore be granted to Gator on this count.

ORDER

58 Swansea's motion for summary judgment on Gator's counterclaim (Dkt #159) is GRANTED. Gator's motion for summary judgment (Dkt #164) is DENIED as to Count VI and GRANTED as to Count VII. Further, the court GRANTS summary judgment on Count VI in 58 Swansea's favor.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE