UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 15-13538-RGS

58 SWANSEA MALL DRIVE, LLC

v.

GATOR SWANSEA PROPERTY, LLC

FINDINGS OF FACT, RULINGS OF LAW,
AND ORDER AFTER A JURY-WAIVED TRIAL

December 12, 2018

STEARNS, D.J.

Based on the credible testimony and exhibits offered at trial, and the stipulations of the parties, I make the following findings of fact.

FINDINGS OF FACT

## A.    Parties and Structure of the Lease

1.    This matter came before the court in an extended bench trial held on February 1, 2, 12, 13, 14, and 15, and April 23, 24, and 25, 2018. It involves a dispute between plaintiff 58 Swansea Mall Drive, LLC (58 Swansea), and defendant Gator Swansea Property, LLC (Gator), that arose under a Ground Lease (the Ground Lease) to certain demised premises (Premises) in Swansea, Massachusetts.

2.     The Ground Lease was executed in 1984 by both parties'
predecessors in interest. 58 Swansea became the Tenant by way of an
assignment on June 13, 2013.  Gator became the Landlord by way of an
assignment on November 14, 2013.   Stipulation of Facts (SOF), Dkt
#248, ¶ 1. The Premises consist principally of a shopping center located
at 58 Swansea Mall Drive, Swansea, Massachusetts (Shopping Center).

3.     58 Swansea is a single-purpose entity created by Jack Corwin to
hold the leasehold interest in the Premises.  58 Swansea acquired the
leasehold interest from Huntington Holdings, Inc., another entity owned
and controlled by Corwin.  Tr. 6 at 51-53; Ex. 117.

4.     Gator is a Florida-based limited liability corporation.  Gator's
managing member is James Goldsmith. Tr. 3 at 6-7.

5.     Portions of the Premises are subleased by 58 Swansea to Dollar
Tree Stores, Inc. (Dollar Tree) and Wakefern Food Corp., d/b/a
PriceRite (PriceRite).  Neither Gator nor its predecessors are parties to
the subleases. Tr. 1 at 46; Exs. 1, 116; SOF ¶ 2.

**B.     The Early Relationship & Maintenance Disputes**

6.     In December 0f 2013, shortly after acquiring the premises,
Gator erected a pylon sign advertising an outparcel for rent in the
Shopping Center.  Ex. 15.

7.      Marjorie Hession, an employee of Northstar Centers LLC, is 58 Swansea's Property Manager. Hession and Corwin discussed the pylon sign when it was erected and agreed that 58 Swansea would not object. Tr. 1 at 105; Ex. 74.

8.      Shortly after the parties acquired their respective interests in the Premises, a dispute arose over 58 Swansea's obligation to maintain the grounds of the Shopping Center. Tr. 1 at 57.

9.      Article 10 of the Ground Lease provided as follows:

ARTICLE 10. REPAIRS AND MAINTENANCE

Throughout the term of this Lease, Tenant agrees that all buildings and improvements that may be erected on the demised premises by Tenant, including, but not limited to all plumbing, electrical, heating, air conditioning and ventilation equipment and systems and all other equipment, will be installed, operated and maintained in good order and condition, wear and tear excepted . . . .

* * *

Throughout the term of this Lease and in accordance with all applicable provisions of this Lease, Tenant, at its sole cost and expense, will take good care of the demised premises and the sidewalks, curbs, and vaults (if any) adjoining the demised premises (including, without limitation, landscaping, paving and lighting), and will make all necessary repairs thereto, interior and exterior, structural and nonstructural, in a good and workmanlike manner. When used in this Article 10, the term repairs shall include all necessary replacements, remedies, alterations, additions and betterments.

Ex. 1 at 14.

10.    In the months after becoming Landlord, Gator issued a series of maintenance demands to 58 Swansea complaining about the condition of the parking lot, the sidewalks, the parking lot lighting, and the roof and façade of the Shopping Center.   Demand letters were sent on the following dates.

    a. May 24, 2014: Gator requested action concerning trash, landscaping, and fencing, stating that a failure to address the issues within 30 days would "leave the Landlord no alternative but to rectify at your [Tenant's] sole cost and expense." Ex. 88.

    b. June 20, 2014: Gator noted that "there has been an improvement from the last inspection in May," referring however to weeds that created an "unsightly appearance," that it would "rectify at your sole cost" if not timely addressed.  Ex. 89.

    c. June 23, 2014: Gator informed 58 Swansea of a missing electrical box cover behind the Price Rite and the Dollar Tree stores.  Ex. 121.

    d. August 4, 2014: Gator stated that a "couple of photos" taken on a recent "site visit" showed cracks in the parking lot near a delivery dock and a weed growing on a wall.  Ex. 122.  That Gator notice also raised a concern that it had not received a copy of 58 Swansea's "current standard extended coverage insurance naming Gator Swansea Property, LLC as an additional named insured as outlined in Article 4 of the Ground Lease."  Ex. 122.

    e. February 11, 2015: Gator wrote a letter referring to the state of maintenance of the Shopping Center grounds in general, without referencing any specific issues, but concluding that "the tenant has not been maintaining the property and common areas in a reasonable manner" and

demanding a "first class, clean and presentable" condition.  Ex. 30

11.    None of these notices used the words "breach" or "default."

12.    In early 2015, Boston experienced a record level of snowfall, with almost nine feet of snow accumulating in a matter of weeks.  Snow removal resulted in further wear and tear to the surface of the parking lot.  Because of the intense cold, resurfacing of the parking lot with asphalt before the spring was impractical.  *See* Tr. 1 at 49-50, 90.

## C.    58 Swansea Seeks to Mortgage Its Leasehold Interest

13.    In March of 2015, 58 Swansea hired Michael Marcone to broker a mortgage loan from United Bank.  SOF ¶ 3.

14.    The Ground Lease permitted 58 Swansea to mortgage its leasehold interest under certain conditions, including that 58 Swansea not be "in default . . . beyond the applicable grace periods." Ex. 1, Art. 6 § 3.  At the time that it applied for the mortgage, 58 Swansea did not disclose the maintenance dispute with Gator to United Bank.  Tr. 5 at 94-96; Ex. 108.

15.    As collateral for the mortgage, 58 Swansea offered its leasehold interest in the Premises.  Ex. 3.

16.     Nicholas Helides represented United Bank in the mortgage negotiations. United Bank retained attorney Leonard Simons to prepare the closing.

17.     On March 16, 2015, Corwin presented a $25,000 check to United Bank and accepted a conditional offer of a seven-year non-recourse loan. Exs. 3, 109.  To satisfy United Bank that it was not in default under the Ground Lease, 58 Swansea invoked Article 14, Section 4 of the Lease. Section 4 obligated Gator as Landlord (subject to certain conditions) to deliver an "estoppel certificate" within ten days of a request. Ex. 1. Article 14 of the Ground Lease required that the estoppel certificate verify that the lease remained "in full force and effect" and describe "any setoffs or defenses against the enforcement of any of the agreements, terms, covenants or conditions of this Lease and any modifications of this Lease upon the part of Tenant to be performed or complied with, and if so, specifying the same." Ex. 1, Art. 14 § 2.

18.     Article 6, Section 6 of the Ground Lease further provided that:

Landlord shall, without charge, at any time and from time to time, within ten (10) days after request by Tenant, certify by written instrument, in form submitted by Tenant, duly executed, acknowledged and delivered by Landlord, whether or not this Lease is in full force and effect; that this Lease is unmodified (or, if it has been modified, that the same is in full force and effect as modified and what modifications there have been); whether Tenant has or has not, as the case may be,

faithfully and fully made all payments then and theretofore due to Landlord; whether there has been any change in ownership of title of the demised premises affecting the right of Landlord to receive or continue to receive payments of rent due under this Lease; the dates to which rent payable has been paid; and whether Landlord knows or does not know, as the case may be, of any default by Tenant in the performance by Tenant of any of the covenants, conditions and agreements on Tenant's part to be performed, such instrument to include reasonable detail as to each such default.

Ex. 1 at 11.

19.     After some misdirection, Gator received the request for the estoppel certificate on June 22 or 23, 2015.  Ex. 9.

20.     On June 26, 2015, Gator provided 58 Swansea with an estoppel certificate.  However, the certificate stated: "Tenant is in breach of the lease for maintenance including, but not limited to, lighting, parking lot replacement, landscaping and curbing."  Ex. 10.  The certificate also did not recite that the Ground Lease was "in full force or effect."

21.     On July 2, 2015, Marc Shandler, Gator's General Counsel, wrote an email to Lowell Salesin, 58 Swansea's real estate counsel.  The email stated, in pertinent part:

Lowell – The principal of the firm has advised us as follows:

The landscaping needs to be completed [sic] redone. Including the rear, repaving the entire parking lot with 2 inches over lay, replace all lighting that is not working, repair the pylon sign, paint the building, fix the sidewalk and repair all curbs.  The place is in complete disrepair.

Ex. 90.

22.    On July 30, 2015, Gator signed a new Landlord Estoppel Certificate with the recitation that the Ground Lease was then "in full force and effect."  However, the certificate also included the following language with respect to the percolating issues of default and maintenance:

> Tenant is not in default under the Lease beyond the applicable grace, notice and/or cure periods and, except for the repairs and maintenance as evidenced by the construction documents attached hereto as Exhibit B, Landlord does not know of any other defaults, except for the below-stated, by Tenant in the performance by Tenant of any of the covenants, conditions and agreements on Tenant's part to be performed other than the repairs and maintenance to be performed described in the preceding sentence; provided, however, that Landlord reserves the right to declare a default by Tenant under the Lease in the event Tenant does not complete the repair and maintenance work identified on the construction documents attached hereto as Exhibit "B" within ninety (90) days after the date of this Estoppel Certificate. Other than the foregoing standstill agreement with respect to the aforesaid repair and maintenance work, nothing in this Estoppel Certificate shall be construed as a waiver of any of Landlord's future rights or remedies under the Lease.

Ex. 24.

23.    Puzzled by the tentative language of the certificate, United Bank requested a clarification from Gator.  The Bank pointed to Article 6, Section 3(n) of the Ground Lease, which provided that in the event that

the tenant sought to mortgage its leasehold interest, the "Landlord shall, upon request, execute, acknowledge and deliver to each Leasehold Mortgagee making such request an agreement prepared at the sole cost and expense of Tenant, in a form reasonably satisfactory to such Leasehold Mortgagee, between Landlord, Tenant and such Leasehold Mortgagee, agreeing to all of the provisions of this Section." Ex. 1.

24.    On August 15, 2015, United Bank's Helides wrote in an email to 58 Swansea's mortgage broker Marcone: "There is an issue that affects our ability to perfect our position.  Ground Lease estoppel has the borrower on notice of default.  Jack [Corwin] called me last week to tell me of his progress to cure."  Ex. 54.

25.    On August 18, 2015, United Bank's attorney Simons sent a copy of the conditional Leasehold Mortgage to Shandler, his Gator counterpart.  Ex. 25.  The email included a pre-closing request that Gator execute a Section 3(n) Agreement.

## D.    Gator's Insurance Concerns and the Outparcel

26.    Apart from the maintenance dispute, Gator raised two additional concerns as negotiations over the mortgage progressed. The first involved Gator's suspicion that 58 Swansea was not abiding by its insurance obligations under the Ground Lease.

27.    The Ground Lease conferred certain rights on Gator with respect to insurance proceeds in the event of a casualty loss at the Premises.  Article 4, Section 2 of the Ground Lease required 58 Swansea to maintain casualty insurance in an amount equal to the full replacement value of the Premises with improvements, and to add Gator to the policy as an additional named insured, together with Gator's lender (defined by the Ground Lease as the "Institutional First Mortgagee").

> Tenant covenants that it will throughout the term of this Lease keep or cause to be kept the buildings and improvements it constructs on the demised premises insured against loss or damage by fire and such other hazards as are currently embraced in the standard extended coverage endorsement in the jurisdiction where such property is located and for the full replacement value of said buildings and improvements.  All insurance policies carried or cause to be carried by tenant pursuant to this Article Section shall be issued in the name of Tenant with Landlord and any Institutional first mortgagee designated by Landlord as an additional named Insured as its interest may appear.

Ex. 1.

28.    Article 5, Section 1 of the Ground Lease further obligated 58 Swansea in the event of a casualty to rebuild the Premises to the extent made possible by the available insurance proceeds.   If the casualty resulted in an early termination of the Ground Lease, the insurance

proceeds were to be paid directly to Gator, thereby releasing 58 Swansea from its obligation to rebuild the Premises.

29.    Article 14 of the Ground Lease permitted Gator to pledge the right to receive the insurance proceeds to the Institutional First Mortgagee.   Section 1 of Article 18 of the Ground Lease required 58 Swansea, in the event of a termination of the lease, to surrender to Gator the real property constituting the Premises, and any improvements.

30.    The Ground Lease did not permit 58 Swansea to pledge the insurance proceeds as collateral. Tr. 9 at 19-21.

31.    The Ground Lease allowed for flexibility with respect to other types of insurance: for example, Section 8 of Article 4 of the Ground Lease provides: "Notwithstanding anything to the contrary hereinabove contained, either party may, at its option, include any of the insurance coverage hereinabove set forth in general or blanket policies of insurance."  Ex. 1 at 6 Art. 4, § 8.

32.    Article 6, Section 3(i) of the Ground Lease provided that in situations where a leasehold mortgage was in effect:

> Landlord agrees that the name of the Leasehold Mortgagees may be added to the "Loss Payable Endorsement" of any and all insurance policies required to be carried by Tenant hereunder on condition that the insurance proceeds are to be applied either by Tenant or by any such Leasehold Mortgagee in the manner specified in this Lease.

Ex. 1.

33.    At all relevant times, 58 Swansea maintained property insurance and casualty insurance covering the Premises in the amounts required, as well as umbrella insurance and additional coverage secured by subtenants. *See* Exs. 119 at LOCK015437 (schedule of properties insured); Ex. 116 at 13 ¶ 11.3 (sublease with the Dollar Tree Store requiring it "to comply with all of the insurance requirements and obligations of Landlord under the Primary Lease"); Tr. 6 at 30:14-34:17 (describing 58 Swansea's compliance with its insurance obligations under the Ground Lease).

34.    58 Swansea engaged Lockton Insurance Brokers, LLC (Lockton), to obtain coverage for the Premises.  Lockton obtained the insurance through Zurich American Insurance Company (Zurich).

35.    58 Swansea relied on Lockton to deliver the certificates of insurance, including certificates showing Gator as an additional named insured. Tr. 6 at 30:1-33:1. Gator, however, was not added as an additional named insured on the policy until October 27, 2015.  The request to add Gator as a named insured was only made a few days before.

36.     No evidence was offered at trial suggesting that 58 Swansea knew that the information in the certificates of insurance was inaccurate. *See* Order on Def's Mot. for Summ. J. at 10 n.4, Dkt. #195 ("Gator has offered no evidence suggesting that 58 Swansea knew of the alleged gaps in insurance coverage at the time the certificates were provided.").

37.     On June 17, 2015, and June 22, 2015, Corwin exchanged emails with Lockton asking that United Bank be added to the insurance certificates as a loss payee.  Tr. 5 at 174-175; Ex. 115.

38.     On September 1, 2015, 58 Swansea received from Lockton a copy of the Zurich policy.  The policy did not contain an endorsement listing Gator as an additional named insured. Ex. 119.

39.     In addition to its omission as a named insured on the insurance certificates, Gator had concerns about the following clause in the proposed United Bank mortgage:   "Unless otherwise required by the Ground Lease and except as hereinafter provided, the proceeds of any insurance resulting from any loss with respect to the Property shall be paid to the Bank and, after the occurrence of an Event of Default, at the option of the Bank . . . . "  Ex. 2 ¶ 4.

40.     The second issue involved Gator's desire to locate a Chick-Fil-A restaurant on an outparcel at the Premises.

41.     On August 17, 2015, Goldsmith exchanged emails with a broker regarding a lease to Chick-Fil-A.  Goldsmith wrote: "We can do something."  The broker advised him that the ground rent "[p]robably has to be under $100K as-is in that market." Goldsmith tentatively settled on an annual rent request of between $80,000 to $100,000. Ex. 22; *see also* Tr. 9 at 63:16-63:21.

42.     That same day, Goldsmith directed his staff to draft a proposed layout of the available space for Chick-Fil-A. Ex. 22.

43.     On August 20, 2015, during the ongoing negotiations over the Section 3(n) agreement, Shandler sent an email to Simons and Salesin, stating: "Len — as promised in our phone conversation today, attached in [sic] the property condition report.  Thanks, Marc."  Exs. 79, 15.

44.     Approximately 21 minutes later, Simons responded, stating: "Thanks — the estoppel you provided had work orders attached that specified the work that needed to be done, so I am not sure what I am supposed to do with the property report or why Jim wanted me to have it. Let me know if I am missing something.  Thx, Len." Ex. 97.

45.     Shandler forwarded Simon's August 20, 2015 email to Goldsmith, asking: "Do you wish me to respond to him? Marc." *Id.* Goldsmith responded to Shandler by email the next morning, August 21,

2015, at 7:14 a.m.: "We are okay following the lease if they agree to the outparcel land.  Show chick filet [sic]." *Id.*

46.    58 Swansea came to believe that Gator's assent to the Section 3(n) agreement was conditioned on 58 Swansea's agreement to allow a Chick-Fil-A restaurant to locate on the Premises.

**E.    Negotiations Break Down**

47.    On August 24, 2015, Shandler and Salesin exchanged further emails regarding the Section 3(n) agreement.  Shandler reported: "Len – I am sorry, but I do not have a definitive response at the moment.  Jim [Goldsmith] and I are discussing and I will get back to you as soon as I can."  Ex. 27.

48.    On August 24, 2015, Simons wrote to Salesin recommending that 58 Swansea go forward with a "dry" closing of the mortgage.  Simons also informed Salesin that in his opinion Gator was not obligated to sign the Section 3(n) agreement prior to the closing.  Ex. 80.

49.    On August 31, 2015, Shandler wrote to Salesin stating, in pertinent part: "Lowell, Pursuant to my voice mail this morning, we are interested in having your client release a portion of the leased premises to the Landlord for the purposes of locating a Chick-Fil-A on the site, as shown on the attached plan."  Ex. 93.

50.    On September 1, 2015, Salesin replied: "Marc, I got your voice mail and email.  Have you signed the agreement with our lender?  I am confused as to the further delay on your part on meeting this requirement under the ground lease.  Please confirm that you are coordinating and delivering that agreement today.  I will forward your request below to my client. Thanks. – Lowell."  Ex. 92.

51.    Shandler responded approximately 94 minutes later, stating: "Jim is out of town and he and I will review tomorrow. We look forward to receiving your client's response." *Id.*

52.    Salesin replied: "Marc, review what tomorrow?  The agreement that you and Jim already discussed with our Lender that you have had for some time now?  Please get it signed and returned.  We are really out of time on this." *Id.*

53.    On September 8, 2015, United Bank and 58 Swansea conducted an unfunded dry closing of the mortgage intended to trigger Section 3(n) of the Ground Lease (a side letter agreement expressly conditioned the funding on Gator's assent to a Section 3(n) agreement).  Ex. 55; SOF ¶ 4.

54.    On September 22, 2015, United Bank sent Gator a signed copy of the Leasehold Mortgage and a draft agreement for Gator to sign under Section 3(n).  Ex. 60.

55.     The Leasehold Mortgage contained the following clause concerning insurance proceeds:

> 4. Insurance Proceeds. Unless otherwise required by the Ground Lease and except as hereinafter provided, the proceeds of any insurance resulting from any loss with respect to the Property shall be paid to the Bank and, after the occurrence of an Event of Default, at the option of the Bank, be applied to the Obligations in such order as the Bank shall determine; provided however, that, notwithstanding any such Event of Default if the Bank shall require restoration or repair of the Property, the Bank may release all or any portion of such proceeds to Mortgagor for such purpose, subject to such terms and conditions as the Bank may reasonably require. Any insurance proceeds paid to Mortgagor shall be held in trust for the Bank and promptly paid to it. Notwithstanding the foregoing, the terms of this Section 3 are subject to the obligations of the Landlord under the leases to the extent required to apply any such proceeds to the reconstruction of the Property. In the event of a loss at the Property which does not result, either directly or indirectly in the termination of any lease at the Property, and no Event of Default has occurred Bank shall permit the proceeds paid to Mortgagor as a result of such loss, to be used to restore the Property. Such restoration shall be subject to the review and approval of Bank and such proceeds shall be deposited with Bank and disbursed by it for such Restoration upon the same terms and conditions, and subject to the same requirements that would apply to a construction loan by Bank for a commercial project.

Ex. 2 ¶ 4.

56.     Because of an internal misrouting, Gator's principals did not see the September 22 draft agreement until October 5, 2015. Tr. 3 at 107; Tr. 4 at 126-127.

57.     On September 25, 2015, Shandler wrote to David Weiss, copying Goldsmith, Corwin, Salesin, Simons, and Nigro, stating: "Rather than exchange emails, we would prefer to have a call with you and your client.  We made a proposal several weeks ago to your client through Lowell Salesin concerning an outparcel on the property and have not yet heard a response. . . . Please also be aware that we have not yet received the required notices from the Tenant pursuant to the lease in connection with a leasehold mortgage."  Ex. 31.

58.     On September 28, 2015, Gator received a request from United Bank for an executed copy of a Section 3(n) agreement.  SOF ¶ 5.

59.     United Bank refused to accept any of the various versions of a Section 3(n) agreement subsequently proposed by Gator.  SOF ¶ 6.

60.     58 Swansea filed this lawsuit on October 2, 2015.  Gator was served with process the same day.  *See* Dkt #1 at Ex. A.  The lawsuit sought, *inter alia*, an injunctive order directing Gator to execute a Section 3(n) agreement.  Dkt #180 at 56.

61.     On October 13, 2015, 58 Swansea filed a Motion for a Preliminary Injunction seeking to enjoin Gator from terminating the Ground Lease and requiring Gator to sign a Section 3(n) agreement acceptable to United Bank.  *Id.* at No. 74.

62.    On October 14 and 16, 2015, Gator renewed, in writing, its contention that the terms of the proposed Mortgage conflicted with Gator's insurance rights under the Ground Lease.   Gator informed 58 Swansea that it would only agree to a revised Section 3(n) agreement that confirmed that "United Bank's rights as mortgagee can in no way supersede [Gator's] rights under the [Lease] such as [Gator's] right to receive insurance proceeds . . . ."  *Id.* at No. 77.

63.    On October 15, 2015, this court denied 58 Swansea's prayer for a preliminary injunction.   Dkt #19.

64.    On October 15, 2015, at 58 Swansea's request, United Bank extended the deadline for the execution of a Section 3(n) agreement to the close of business on October 21, 2015.  Ex. 63.

65.    On October 20, 2015, and October 21, 2015, 58 Swansea and United Bank circulated drafts of a Section 3(n) agreement that acceded to Gator's demand with respect to any insurance proceeds.  Exs. 33, 66.

66.    On October 22, 2015, Corwin wrote to Shandler stating his position with respect to the insurance issue:

> Gator is not now, never has been and will never be an additional insured for property damage under our insurance policy. There is no requirement in the lease that Gator be an additional insured and in fact there are provisions to the contrary that call for an institutional lender to our leasehold interest to be an

additional insured and receive the first proceeds under such insurance.

Dkt #180, Summ. J. SOF No. 87 (Corwin Dep. Ex. 94).

67.    On October 23, 2015, Gator wrote to Lockton requesting copies of the relevant insurance documents to confirm that Gator was, in fact, an additional named insured under the Zurich Policy. *Id.* at No. 99.

68.    On October 28, 2015, Gator repeated its demand that 58 Swansea respond to its prior inquiries regarding the Zurich Policy.

69.    Simons testified at trial that United Bank would not close on the loan without having the first recourse to any casualty insurance proceeds needed to satisfy the mortgage in the Event of Default under the Ground Lease.

70.    Gator provided United Bank with four alternative versions of the Section 3(n) agreement on October 14, 20, 21, and 23, all of which United Bank rejected.

71.    The October 20 version was acceptable to 58 Swansea, and Corwin encouraged United Bank to accept it.  Exs. 33, 67, 77, 104. United Bank, however, refused.

72.    On October 28, 2015, United Bank notified 58 Swansea that the proposed mortgage loan was no longer viable.  SOF ¶ 7.  The termination letter stated in pertinent part:

This is to notify you that, as a result of the failure of Gator Swansea Property, LLC ("Gator") to enter into a form of agreement reasonably satisfactory to United Bank (the "Bank"), in compliance with, and as required by Section 6(3)(n) of the Ground Lease dated May 20, 1984, as amended (the "6(3)(n) Agreement") you have not met the deadline (which has been extended twice) for delivery of the 6(3)(n) Agreement contained in the letter agreement between you and the Bank dated September 8, 2015, as amended (the "Post Closing Letter"). Therefore, the availability of the $2,000,000 term loan evidenced by the Commercial Promissory Note dated September 8, 2015 is terminated. I am enclosing a form of discharge of the recorded documents.

Ex. 29.

73. On October 30, 2015, 58 Swansea sent an email to Gator enclosing endorsements to the Zurich Policy adding Gator as a named insured. On December 8, 2015, Gator wrote to 58 Swansea stating that it was satisfied with the current condition of the Premises as well as the endorsement to the Zurich Policy adding Gator as a named insured. Dkt #180, Summ. J. SOF No. 104.

74. Corwin decided against pursuing a recourse loan from United Bank in December of 2015. *Id.* at No. 106.

## CLAIMS OF THE PARTIES

1. 58 Swansea's lawsuit advanced, inter alia, claims for breach of contract (Count I), breach of implied covenant of good faith and fair dealing (Count II), and violation of Mass. Gen. Laws ch. 93A (Count IV).

58 Swansea contends that Gator's failure to sign a Section 3(n) agreement – more particularly, the September 22, 2015 version – in a form reasonably acceptable to United Bank within a reasonable time period was done in bad faith. Because Gator had received a "true copy" of the recorded mortgage, 58 Swansea contends that it was contractually obligated under Article 6 of the Ground Lease to execute the Section 3(n) agreement.

2. 58 Swansea further contends that Gator's professed hesitations to sign the Section 3(n) agreement were either unfounded or pretextual. With respect to the insurance issue, 58 Swansea claims that any concerns that Gator had about being deprived of the priority right to receive insurance proceeds under the Ground Lease clashed headlong with the clause of the mortgage specifying that its terms applied "[u]nless otherwise required by the Ground Lease." 58 Swansea also claims that Gator's inquiries about the outparcel and the refusal to sign the Section 3(n) agreement were a conjoined stratagem to coerce 58 Swansea into agreeing to a release of the outparcel to accommodate the Chick-Fil-A franchise.

3. 58 Swansea claims recoverable "general damages with respect to the lost value in its leasehold interest that resulted from Gator's

prevention of non-recourse financing . . . of at least $1.3 million," bank fees and legal fees of $99,800, and interest attributable to loans from Huntington Holdings totaling $217,000. It also seeks attorneys' fees and costs, and treble damages under Chapter 93A. 58 Swansea's Proposed Findings ¶¶ 37-39 (Dkt #325).

4.      Gator, for its part, contends that 58 Swansea was in default of its obligations under the Ground Lease with respect to maintenance and casualty insurance and therefore failed to fulfill the conditions precedent to the Section 3(n) agreement. Gator also argues that the September 22, 2015, form of Section 3(n) agreement would have had the effect of granting insurance rights to United Bank that did not exist under the Lease.

5.      Finally, and apart from its arguments on liability, Gator argues that 58 Swansea has no recoverable damages for its loss of financing from United Bank.

6.      Gator seeks attorneys' fees as the prevailing party under Article 13 of the Ground Lease, which provides that: "If Landlord or Tenant shall incur any expense, including reasonable attorney's fees, in instituting, prosecuting, or defending any action or proceedings

instituted by reason of default by the other, the defaulting party shall reimburse the other for the amount of such expenses." Ex. 1

RULINGS OF LAW

1.      In the absence of a contractual definition, the ordinary meaning of a term controls in contract interpretation.  *See Rogaris v. Albert*, 431 Mass. 833, 835 (2000).

2.      "[A] contract should be construed to give it effect as a rational business instrument and in a manner which will carry out the intent of the parties. 'Justice, common sense, and the probable intention of the parties are guides to construction of a written instrument.'" *Shane v. Winter Hill Fed. Sav. & Loan Ass'n*, 397 Mass. 479, 483 (1986) (internal citation omitted); *see also Stop & Shop, Inc. v. Ganem*, 347 Mass. 697, 701 (1964).

3.      A party that prevents performance of a contract cannot sue for non-compliance. *See Frank Fitzgerald, Inc. v. Pacella Bros., Inc.*, 2 Mass. App. Ct. 240, 242 (1974), citing *Frazier v. Cushman*, 12 Mass. 277, 279 (1815); *see also United States v. Peck*, 102 U.S. 64, 65-66 (1880) (finding that defendants prevented and hindered the claimant from performing his part of the contract because agents of the defendants encouraged plaintiff to rely on a particular means of fulfilling his

contract until it was too late to perform in any other way and then defendants took the supply of hay on which plaintiff's performance depended); *Northeast Drilling, Inc. v. Inner Space Services, Inc.*, 243 F.3d 25, 40 (1st Cir. 2001) (citing Restatement (Second) of Contracts § 245 (1981), for the proposition that preventing performance of a contract includes hindering performance or engaging in actions which makes the other party's performance detrimental).

4.    "The covenant of good faith and fair dealing is implied in every contract."  *Uno Rests., Inc. v. Bos. Kenmore Realty Corp.*, 441 Mass. 376, 385 (2004). The covenant requires parties to "deal honestly and in good faith in both the performance and enforcement of the terms of their contract."  *Hawthorne's, Inc. v. Warrenton Realty, Inc.*, 414 Mass. 200, 211 (1993).  The plaintiff need not prove bad faith, but merely "a lack of good faith," which "can be inferred from the totality of the circumstances."  *T.W. Nickerson, Inc. v. Fleet Nat'l Bank*, 456 Mass. 562, 570 (2010).

5.    The covenant is breached by exploiting "a discretionary right . . . as a pretext" to extract extra contractual concessions, *Anthony's Pier Four, Inc. v. HBC Assocs.*, 411 Mass. 451, 473 (1991), or by "tak[ing] an extreme and unwarranted view of [a party's] rights under the contract"

to justify a refusal to engage in good-faith efforts to resolve conflicts, *Robert & Ardis James Found. v. Meyers*, 474 Mass. 181, 191 (2016).

6.      To prevail on a Chapter 93A claim, 58 Swansea must show that Gator's conduct was egregious, committed in bad faith, and with an extortionary motive. A mere breach of contract does not give rise to a Chapter 93A violation. *Whitinsville Plaza, Inc. v. Kotseas,* 378 Mass. 85, 100-101 (1979); *Madan v. Royal Indem. Co.,* 26 Mass. App. Ct. 756, 762 (1989).  Under the test of *Atkinson v. Rosenthal*, 33 Mass. App. Ct. 219 (1992), Chapter 93A reaches only those breach of contract cases that have an extortionate quality. *Framingham Auto Sales, Inc. v. Workers' Credit Union*, 41 Mass. App. Ct. 416, 418 (1996) (for a commercial breach to be actionable, there must be an ulterior motive, or coercive or extortionate objective). It is not . . . immoral, unethical, oppressive, or unscrupulous -- and therefore not unfair or deceptive -- to break off incomplete and imperfect negotiations of a commercial agreement. Every deal that goes sour does not give rise to a [Chapter] 93A claim." *Pappas Indus. Parks, Inc. v. Psarros*, 24 Mass. App. Ct. 596, 600 (1987).

7.      While damages need not be proven with precision, a plaintiff is required to establish its losses to a reasonable degree of certainty.  *Pierce v. Clark*, 66 Mass. App. Ct. 912, 914 (2006).  The "rule of damages in an

action for breach of contract is that the plaintiff 'is entitled in general to damages sufficient in amount to compensate him for the loss actually sustained by him, and to put him in as good position financially as he would have been in if there had been no breach. . . . He may not insist upon extraordinary or unforeseen elements of damages, but only such as flow according to common understanding as the natural and probable consequences of the breach . . . .'" *Pierce v. Clark*, 66 Mass. App. Ct. 912, 914 (2006), quoting *Boylston Hous. Corp. v. O'Toole*, 321 Mass. 538, 562 (1947). "While it is true that a plaintiff need not prove damages with mathematical certainty, 'damages cannot be recovered when they are remote, speculative, hypothetical, and not within the realm of reasonable certainty.'" *Kitner v. CTW Transport, Inc.*, 53 Mass. App. Ct. 741, 748 (2002), quoting *Lowrie v. Castle*, 225 Mass. 37, 51 (1916). Under Massachusetts law, damages are measured as of the "date of the breach." *Anthony's Pier Four*, 411 Mass. at 478.

## ULTIMATE RULINGS OF FACT AND LAW

1.    The court has considered the parties' testimony as to their respective understandings of Section 3(n) of the Ground Lease. Both sides agree that this provision did not contemplate a mere

acknowledgement of United Bank's rights under Section 3 as a leasehold mortgagee.

2.     Rather, the court concludes that the intent of Section 3(n) was to authorize a tri-partite agreement under which United Bank, 58 Swansea, and Gator would be bound by the provisions of Section 3, including 58 Swansea's obligation to grant insurance rights to United Bank to the extent permitted by Section 3(i), while preserving Gator's rights to any casualty insurance proceeds as guaranteed under the Ground Lease.

3.     While the court previously observed in its Order on Plaintiff's Motion for Summary Judgment, that "Gator's duty was to execute an agreement acknowledging the provisions of Section 3 after being presented with the mortgage and recording information," *see* Dkt #195 at 11, Gator was not under an obligation to do so if it reasonably believed that the terms of the mortgage could lead to future litigation over the distribution of insurance proceeds.

4.     The court ultimately concludes that even though the mortgage contained qualifying language, that "[u]nless otherwise required by the Ground Lease," Gator reasonably believed that the terms of the mortgage conflicted with its insurance rights under the Ground Lease.

Consequently, it had a good faith basis for hesitating to go forward, particularly when it learned that 58 Swansea had yet to cause it to be added as an additional named insured as required by Article 4 of the Ground Lease.

5.    The court therefore finds that Gator did not breach its contractual obligations under Article 6, Section 3(n) of the Ground Lease.

6.    While the parties had a long-simmering disagreement over maintenance issues, the court finds that Gator had the right to insist on the "good care" standard prescribed by Article 10 of the Ground Lease. Therefore, it did not violate the implied covenant of good faith and fair dealing by sending maintenance and repair demands to 58 Swansea. *See Frappier v. Countrywide Home Loans, Inc.*, 750 F.3d 91, 97 (1st Cir. 2014) ("It is well-established . . . that 'a party's acting according to the express terms of a contract cannot be considered a breach of the duties of good faith and fair dealing.'") (citation omitted).

7.    While emails from Shandler suggest a contingent motive to use 58 Swansea's Section 3(n) request as leverage to inveigle an agreement from 58 Swansea to accept a Chick-Fil-A franchise on the outparcel, that

motive quickly fell by the wayside and did not influence Gator's ultimate position with regard to the Section 3(n) agreement.

8.     Gator had a good faith basis to believe that it had the right under the Ground Lease to construct a building and locate a sub-tenant on the outparcel. Gator consequently did not violate the implied covenant of good faith or Chapter 93A by inquiring about 58 Swansea's consent to locating a Chick-Fil-A on the outparcel.

9.     Gator's actions therefore did not constitute the bad faith required for a breach of the implied covenant of good faith. *See Am. Paper Recycling Corp. v. IHC Corp.*, 775 F. Supp. 2d 322, 330 n.8 (D. Mass. 2011) ("Want of good faith 'carries an implication of a dishonest purpose, conscious doing of wrong or breach of a duty through motive of self-interest or ill will.'") (citation omitted).

10.     The court also finds that 58 Swansea was not in material default of its maintenance obligations under the Ground Lease during the period in question.  Even acknowledging that conditions on the premises at times fell short of the "good care" standard required by Section 1(b)(ii) of Article 12 of the Ground Lease, 58 Swansea responded with reasonable diligence, especially given winter weather and other external constraints in making repairs after receiving Gator's complaints.

11.     Gator has failed to prove that any potential default was "beyond the applicable grace period[]." Under the Ground Lease, to constitute a notice of default, a letter required more than simply a request. Ex. 1 at 15, Art. 12 § 1(b)(ii).  Although Gator had informed United Bank at one point that it believed that 58 Swansea was in default of its maintenance obligations, Gator shortly thereafter "withdrew" the declaration of a default.  Goldsmith, Tr. 9 at 60.

12.     Moreover, throughout the entire time that the parties feuded over maintenance, insurance, and the Section 3(n) agreement, Gator continued to accept performance from 58 Swansea.

13.     With respect to the alleged gap in insurance coverage, the court reaffirms its earlier conclusion on summary judgment that 58 Swansea was unaware of the gap in insurance coverage at the time certificates of insurance were provided.  The court thus finds that 58 Swansea was not in default based on any lapse in fulfilling its insurance obligations.

14.     While Gator will prevail on the remaining equitable prayers set out in the Complaint, it is not entitled to attorneys' fees under the Ground Lease; Article 13 limits attorneys' fees and costs to those arising from "instituting, prosecuting, or defending any action or proceedings instituted by reason of default by the other." Ex. 1.

15.    The prayers by 58 Swansea for specific performance, for enjoining the termination of the Ground Lease, for preserving the status quo with respect to the pylon sign and the PriceRite sign, and for declaratory judgment are DENIED as moot.

## ORDER

On the material issues of law, the court rules against both 58 Swansea and Gator.  The Clerk will enter judgment for Gator Swansea Property, LLC as to any outstanding prayers for injunctive and other equitable relief.  No costs or fees are awarded to either party.

SO ORDERED.

/s/ Richard G. Stearns
UNITED STATES DISTRICT JUDGE